In re: **VIOXX PRODUCTS LIABILITY LITIGATION.**

This Document Relates to: All Cases.

**MDL No. 1657.**

United States District Court,
E.D. Louisiana.

Aug. 27, 2008.

---

---

### ORDER & REASONS

ELDON E. FALLON, District Judge.

With interim settlement payments scheduled to begin on August 28, 2008, the Court finds that it is appropriate at this time to address the issue of individual attorneys' fees. For the reasons listed below, the Court orders that individual attorneys' fees for all counsel representing claimants enrolled in the Vioxx Settlement Program will be capped at 32% plus reasonable costs. At a later date, after giving the parties due notice and an opportunity to be heard, the Court will determine the amount of fees and costs to be awarded to those attorneys who performed common benefit work. Pursuant to the terms of the Settlement Agreement, these latter amounts will be deducted from the individual plaintiffs' attorneys' fees.[1]

---

1. Given the nature of the interim payment schedule, it bears emphasizing that no claimant shall pay more than 32% of their total award towards attorneys' fees, and any future award of common benefit fees will come from the individual attorneys' shares of their claim- ants' awards. Because at the present time only interim payments are being distributed, the mechanics of withholding any common benefit fee charge will be finalized upon the ultimate calculation of claimants' total awards.

## I. BACKGROUND

To put this matter in perspective, a brief review of this litigation is appropriate. This multidistrict products liability litigation involves the prescription drug Vioxx, known generically as Rofecoxib. Merck, a New Jersey corporation, researched, designed, manufactured, marketed, and distributed Vioxx to relieve pain and inflammation resulting from osteoarthritis, rheumatoid arthritis, menstrual pain, and migraine headaches. On May 20, 1999, the Food and Drug Administration approved Vioxx for sale in the United States. Vioxx remained publicly available until September 30, 2004, when Merck withdrew it from the market after data from a clinical trial known as AP-PROVe indicated that the use of Vioxx increased the risk of cardiovascular thrombotic events such as myocardial infarctions (heart attacks) and ischemic strokes. Thereafter, thousands of individual suits and numerous class actions were filed against Merck in state and federal courts throughout the country alleging various products liability, tort, fraud, and warranty claims. It is estimated that 105 million prescriptions for Vioxx were written in the United States between May 20, 1999 and September 30, 2004. Based on this estimate, it is thought that approximately 20 million patients have taken Vioxx in the United States.[2]

On February 16, 2005, the Judicial Panel on Multidistrict Litigation conferred multidistrict litigation status on Vioxx lawsuits filed in federal court and transferred all such cases to this Court to coordinate discovery and to consolidate pretrial matters pursuant to 28 U.S.C. § 1407. *See In re Vioxx Prods. Liab. Litig.*, 360 F.Supp.2d 1352 (J.P.M.L.2005). One month later, on March 18, 2005, this Court held the first status conference in the Vioxx MDL to consider strategies for moving forward with the proceedings. Shortly thereafter, the Court appointed committees of counsel to represent the parties and to meet with the Court once every month to review the status of the litigation.[3]

One of this Court's first priorities was to assist the parties in selecting and preparing certain test cases to proceed as bellwether trials. In total, this Court conducted six Vioxx bellwether trials.[4] The first of the bellwether trials took place in Houston, Texas, while this Court was displaced following Hurricane Katrina. The five subsequent bellwether trials took place in New Orleans, Louisiana. Only one of the trials resulted in a verdict for the plaintiff. Of the five remaining trials, one resulted in a hung jury and four resulted in verdicts for the defendant. During the same period that this Court conducted its six bellwether trials, approximately thirteen additional Vioxx-related cases were tried before juries in

---

**2.** For a more detailed factual background describing the events that took place before the inception of this Multidistrict Litigation, see *In re Vioxx Prods. Liab. Litig.*, 401 F.Supp.2d 565 (E.D.La.2005) (resolving *Daubert* challenges to a number of expert witnesses).

**3.** The Court appointed twelve attorneys to serve on the Plaintiffs' Steering Committee ("PSC"), see Pretrial Order No. 6 (Apr. 8, 2005), 2005 WL 850963, and five attorneys to serve on the Defendant's Steering Committee, see Pretrial Order No. 7 (Apr. 8, 2005), 2005 WL 850962.

**4.** *See Plunkett v. Merck & Co.*, No. 05–4046 (E.D. La. filed Aug. 23, 2005) (comprising both the first and second bellwether trials, as the first trial resulted in a hung jury); *Barnett v. Merck & Co.*, No. 06–485, 2006 WL 2667878 (E.D. La. filed Jan. 31, 2006) (third bellwether trial); *Smith v. Merck & Co.*, No. 05–4379, 2005 WL 4773855 (E.D. La. filed Sept. 29, 2005) (fourth bellwether trial); *Mason v. Merck & Co.*, No. 06–0810, 2006 WL 3462781 (E.D. La. filed Feb. 16, 2006) (fifth bellwether trial); *Dedrick v. Merck & Co.*, No. 05–2524, 2005 WL 4912665 (E.D. La. filed June 21, 2005) (sixth bellwether trial).

the state courts of Texas, New Jersey, California, Alabama, Illinois, and Florida. With the benefit of experience from these bellwether trials, as well as the encouragement of the several coordinated courts, the parties soon began settlement discussions in earnest.[5]

On November 9, 2007, Merck and the NPC formally announced that they had reached a Settlement Agreement. *See* Settlement Agreement, *In re Vioxx Prods. Liab. Litig.*, MDL 1657 (E.D.La. Nov. 9, 2007) ("Settlement Agreement"), *available at* http://www.browngreer.com/vioxx settlement.[6] The private Settlement Agreement establishes a pre-funded program for resolving pending or tolled state and federal Vioxx claims against Merck as of the date of the settlement, involving claims of heart attack ("MI"), ischemic stroke ("IS"), and sudden cardiac death ("SCD"), for an overall amount of $4.85 billion. *Id.* § "Re-

citals".[7] The Settlement Agreement expressly contemplates that this Court shall oversee various aspects of the administration of settlement proceedings, including appointing a Fee Allocation Committee, allocating a percentage of the settlement proceeds to a Common Benefit Fund, and modifying any provisions of the Settlement Agreement that are otherwise unenforceable.[8] Accordingly, this Court has consistently exercised its inherent authority over the MDL proceedings in coordination with its express authority under the terms of the Settlement Agreement to ensure that the settlement proceedings move forward in a uniform and efficient manner.[9]

The Settlement Agreement provides a schedule for the disbursement of interim payments to certain eligible claimants. *Id.* § 4.1. In order to qualify for interim payments, eligible claimants must fulfill specific registration and filing obligations. *Id.*

---

5. In their efforts to develop a comprehensive, joint settlement agreement, counsel for Merck and the Negotiating Plaintiffs' Counsel ("NPC") met together more than fifty times and held several hundred telephone conferences. Although the parties met and negotiated independently, they kept this Court—as well as the coordinate state courts of Texas, New Jersey, and California—informed of their progress in settlement discussions.

6. When the parties formally announced the settlement agreement, Vioxx-related discovery had been moving forward in the coordinate jurisdictions for more than six years. Over 50 million pages of documents had been produced and reviewed, more than 2,000 depositions had been taken, and counsel for both sides had filed thousands of motions and consulted with hundreds of experts in the fields of cardiology, pharmacology, and neurology.

7. For a more detailed factual background of the various mechanics of the Settlement Agreement, including the provisions for the mandatory resolution of governmental liens, see *In re Vioxx Prods. Liab. Litig.*, 2008 WL 3285912 (E.D.La. Aug. 7, 2008) (denying motions to enjoin disbursement of interim settlement payments).

8. *See, e.g.,* Settlement Agreement, § 9.2.4 (establishing that the Court shall appoint a Fee Allocation Committee); § 9.2.5 (establishing that the Court shall "provide appropriate notices governing the procedure by which [it] shall determine common benefit attorneys' fees and reimbursement of common benefit expenses"); § 16.4.2 (establishing that the Court may modify any provision of the Agreement under certain limited circumstances if the Court determines that the provision "is prohibited or unenforceable to any extent or in any particular context but in some modified form would be enforceable").

9. *See, e.g.,* Pretrial Order No. 32, Rec. Doc. 13007 (Nov. 20, 2007) (exercising the Court's "inherent authority over this multidistrict litigation" as well as its express authority under Paragraph 9.2.4 of the Settlement Agreement to appoint a Fee Allocation Committee; reserving the right to "issue subsequent Orders governing the procedure by which the Allocation Committee shall carry out its function"; and providing that members appointed to the committee may not be substituted by other attorneys "except with the prior approval of the Court").

Pursuant to the terms of the Settlement Agreement, eligible MI claimants who timely fulfill all of their filing obligations may qualify to receive interim payments beginning on August, 1, 2008, or the date on which the Claims Administrator has determined pre-review points awards for at least 2,500 MI claimants, whichever is later. *Id.* The schedule for distributing interim payments to claimants is conditioned on Merck's decision to waive its walk away privileges. *Id.*

On July 17, 2008, Merck formally announced that it was satisfied that the thresholds necessary to trigger funding of the Vioxx Settlement Program would be met. *See Minute Entry, July 17, 2008,* Rec. Doc. 15362 (July 17, 2008). Merck further advised that it intended to waive its walk away privileges and that it would commence funding the Vioxx Settlement Program by depositing an initial sum of $500 million into the settlement fund, clearing the way for distribution of interim payments to eligible claimants. *Id.* On August 20, 2008, the Claims Administrator reported to the Court that it had successfully reviewed approximately 2,750 claims for interim payments. *See Minute Entry, August 20, 2008,* Rec. Doc. 15674 (Aug. 20, 2008). The Claims Administrator further advised that interim payments were scheduled to begin as early as August 28, 2008. *Id.* In light of the upcoming disbursement of interim settlement payments, it is appropriate at this time to address the issue of individual attorneys' fees.

## II. LAW & ANALYSIS

As an initial matter, the Court notes that addressing the issue of attorneys' fees in the context of the Vioxx global settlement will require a two-step process. The first step involves examining the reasonableness of all the contingent fee contracts in the global settlement and setting an appropriate limitation on the amount of fees that attorneys may charge claimants. The second step of the process will involve allocating a percentage of those fees for the Common Benefit Fund to be distributed to those who performed common benefit work. After notifying the parties and all counsel and offering them an opportunity to be heard, the Court will issue a separate order addressing the Common Benefit Fund. At this time, the Court will only address the reasonableness of contingent fee contracts in the context of the global settlement.

The Court will begin its analysis by reviewing the basis of its authority for examining the contingent fee contracts in this setting. After briefly reviewing the basis of its authority, the Court will then examine the contingent fee contracts and set a reasonable limitation on the amount that individual attorneys may charge claimants enrolled in the global settlement, regardless of whether their cases were filed in state or federal courts.

### A. The basis of this Court's authority to review contingent fee contracts for reasonableness

█ Contingent fee contracts have long been accepted in the United States because "they provide many litigants with the only practical means by which they can secure legal services to enforce their claims." *Cappel v. Adams,* 434 F.2d 1278, 1280 (5th Cir.1970).[10] Nevertheless, "[c]ontingent fees may be disallowed as between attorney and client in spite of contingent fee retainer agreements, where the amount becomes large enough to be

---

**10.** For a detailed analysis of the history of contingent fee arrangements in mass tort litigation as well as the effects that these arrangements might have on the future of mass tort actions, see *Contingent Fees in Mass Tort Litigation,* 42 TORT TRIAL & INS. PRAC. L.J. 105 (2006).

out of all proportion to the value of the professional services rendered." *Gair v. Peck*, 6 N.Y.2d 97, 188 N.Y.S.2d 491, 160 N.E.2d 43, 48 (N.Y.1959).

In addressing contingent fees, the Court is mindful that tort litigation—and particularly mass tort litigation—has a dual role in our society: (1) to compensate people who are harmed; and (2) to prevent future injuries by deterring harmful conduct. *See Contingent Fees in Mass Tort Litigation*, 42 TORT TRIAL & INS. PRAC. L.J. 105, 109–10 (2006). These are laudable goals and ones which should be encouraged. Undercompensating attorneys who handle such litigation would result in too few meritorious private suits being brought and less competent representation in the cases that are brought. *Id.* Overcompensating attorneys, however, would also be harmful, as it would encourage frivolous lawsuits and result in unfair recovery for injured litigants. *Id.* The courts must, therefore, endeavor to strike a fair balance between these two opposing policy concerns.[11]

Before examining the contingent fee contracts in the context of the global settlement, it is first necessary to determine whether this Court has authority to inquire into the reasonableness of contingent fee agreements between the claimants and their attorneys. This determination requires an analysis of the Court's equitable powers, its inherent supervisory authority, and its express authority under the terms of the Settlement Agreement. Each of these will be discussed in turn.

### 1. The Court's equitable authority to oversee administration of the global settlement

The Federal Rules of Civil Procedure expressly provide that district courts may require reasonable fees in class actions. *See* Fed.R.Civ.P. 23(g)(1)(C)(iii); Fed. R.Civ.P. 23(h); *see also* MANUAL FOR COMPLEX LITIGATION (FOURTH) § 22.927 (2004). In the *Zyprexa* MDL, the court found that several factors counseled in favor of treating the case as a quasi-class action, subjecting the settlement program to review under the court's general equitable powers. *See In re Zyprexa Prods. Liab. Litig.*, 424 F.Supp.2d 488, 491 (E.D.N.Y. 2006). In particular, the court in *Zyprexa* noted as persuasive "[t]he large number of plaintiffs subject to the same settlement matrix approved by the court; the utilization of special masters appointed by the court to control discovery and to assist in reaching and administering a settlement; the court's order for a huge escrow fund; and other interventions by the court." *Id.* As a result, the court found that the settlement was subject to the court's "imposition of fiduciary standards to ensure fair treatment to all parties and counsel regarding fees and expenses." *See id.*; *see also In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, MDL No. 05–1708, 2008 WL 682174, at *18 (D.Minn. Mar. 7, 2008) (characterizing a mass tort proceeding as a quasi-class action and subjecting the global settlement to the court's equitable authority).

Turning to the instant case, the Court notes that there are substantial similarities between the global settlement currently before the Court and the global settlement at issue in *Zyprexa*. First, the court in *Zyprexa* found that the case could be treated as a quasi-class action in part because of "[t]he large number of plaintiffs subject to the same settlement matrix approved by the court." *In re Zyprexa*, 424 F.Supp.2d at 491. Similarly, there are

---

**11.** *See id.* at 111 ("It is thus crucial to calibrate compensation for lawyers who prosecute mass tort cases to provide enough incentive for them to be brought (to serve the deterrence and compensation functions) but not so much that nonmeritorious cases are brought or victims are undercompensated.").

approximately 50,000 eligible claimants currently enrolled in the Vioxx Settlement Program, all of whom are subject to the same settlement matrix for awarding points and valuating claims. Second, like the court in *Zyprexa,* which utilized special masters "to control discovery and to assist in reaching and administering a settlement," this Court has benefited from the efforts of special masters throughout the course of the MDL proceedings and the settlement administration. *See, e.g., Order,* Rec. Doc. 13228 (Jan. 14, 2008) (appointing Mr. Patrick A. Juneau to act as Special Master pursuant to the terms of the Settlement Agreement). Moreover, the $4.85 billion settlement fund in the instant case is similar to the large settlement fund held in escrow in *Zyprexa.* In light of these factors, the Court finds that the Vioxx global settlement may properly be analyzed as occurring in a quasi-class action, giving the Court equitable authority to review contingent fee contracts for reasonableness.

### 2. The Court's inherent authority to exercise ethical supervision over the parties

In addition to this Court's equitable authority over the global settlement, the Court also has the inherent authority and concomitant duty to exercise ethical supervision over the parties. *See In re Zyprexa,* 424 F.Supp.2d at 492 ("The judiciary has well-established authority to exercise ethical supervision of the bar in both individual and mass actions."); *see also Karim v. Finch Shipping Co., Ltd.,* 233 F.Supp.2d 807, 810 (E.D.La.2002), *aff'd,* 374 F.3d 302 (5th Cir.2004) ("Among the broad equitable powers of a federal court is its supervisory capacity over an attorney's contingent fee contracts.").[12] Pursuant to the Court's supervisory authority, the Court may address the reasonableness of contingent fee contracts even if the parties have not raised the issue. *See Rosquist v. Soo Line R.R.,* 692 F.2d 1107, 1111 (7th Cir. 1982) ("Even when the validity of the fee contract itself has not been challenged by the parties, it is within the court's inherent power of supervision over the bar to examine the attorney's fee for conformance with the reasonable standard of the Code of Ethics."). District courts necessarily retain the authority to examine attorney fees sua sponte because the attorneys' interests in this regard are in conflict with those of their clients. *See In re Guidant,* 2008 WL 682174, at *18 ("[A]s for the representative counsel involved, Plaintiffs' counsel have a built-in conflict of interest that is directly opposed to that of their clients."); *In re Zyprexa,* 424 F.Supp.2d at 491–92 ("[P]laintiffs' counsel have a built-in conflict of interest; and the defendant is buying peace and is generally disinterested in how the fund is divided so long as it does not jeopardize the settlement.").

---

**12.** Historically, a district court's supervisory authority to examine contingent fee contracts for fairness is well-settled and has longstanding roots in a variety of different areas of law. *Karim,* 233 F.Supp.2d at 810. For example, federal courts have long endeavored to protect seamen from unfair contingent fee contracts:

Federal courts, particularly when sitting in admiralty, have long protected seamen when they enter into contracts with those more skilled than they. As long ago as 1823, Justice Story penned these famous words: "They (referring to seamen) are emphatically wards of the admiralty; and though not technically incapable of entering into a valid contract, they are treated in the same manner, as courts of equity are accustomed to treat young heirs dealing with their expectancies, wards with their guardians, and *cestuis que trust* with their trustees."

*Id.* (quoting *Harden v. Gordon,* 11 F.Cas. 480, 485 (1823)).

With large corporations now seeking to achieve global peace by resolving mass tort litigations simultaneously in state and federal courts, settlement agreements such as the one currently before the Court will likely become more common. *See, e.g., In re Guidant,* 2008 WL 682174, at *3 (noting that the parties "contemplated a global settlement covering Plaintiffs from both the MDL and state cases, and included Plaintiffs whose cases had been filed or transferred to the MDL, Plaintiffs whose cases were filed outside the MDL in state court proceedings, and potential Plaintiffs who had not yet filed their cases"). As these global settlements occur more frequently, however, and as the public consciousness focuses more closely on the outcome of mass tort litigations, there will also be a growing need to protect the public's trust in the judicial process. *See In re Zyprexa,* 424 F.Supp.2d at 494 ("Public understanding of the fairness of the judicial process in handling mass torts—and particularly those involving pharmaceuticals with potential widespread health consequences—is a significant aspect of complex national litigations involving thousands of parties.").

The potential harm to the public's perception of the judicial process is especially acute in the instant case because of the large number of claimants participating in the settlement. *See id.* at 493 ("The risk of excessive fees is a special concern here because of the mass nature of the case."). The approximately 50,000 plaintiffs and the $4.85 billion settlement fund have captured the public's attention, resulting in a heightened degree of public scrutiny on the settlement proceedings and the judicial

process in general. Disproportionate results and inconsistent standards threaten to damage the public's faith in the judicial resolution of mass tort litigation by creating an impression of inherent unfairness. *Id.* at 494 ("Litigations like the present one are an important tool for the protection of consumers in our modern corporate society, and they must be conducted so that they will not be viewed as abusive by the public; they are in fact highly beneficial to the public when adequately controlled.").[13] "These considerations are enhanced where, as here, the Judicial Panel on Multidistrict Litigation has assembled all related federal cases for coordinated or consolidated pretrial proceedings ... [to] *promote the just and efficient conduct of such actions.*'" *Id.* at 493 (quoting 28 U.S.C. § 1407) (emphasis added).

In addition, many of the Vioxx claimants are elderly and in poor health, making it more difficult for them to negotiate fair contingent fee contracts. *See id.* at 491 ("Many of the individual plaintiffs are both mentally and physically ill and are largely without power or knowledge to negotiate fair fees"); *see also In re Guidant,* 2008 WL 682174, at *18 (same). In order to qualify for the settlement, a claimant or the claimant's representative must first demonstrate that the claimant suffered a heart attack, ischemic stroke, or sudden cardiac death after taking Vioxx. As a result, all of the claimants in the global settlement have suffered life-threatening injuries. Under such circumstances, the supervisory court has an increased responsibility to ensure that the fees are both consistent and reasonable. For these rea-

---

**13.** *See also Contingent Fees in Mass Tort Litigation, supra,* at 125 (noting that several courts "have invoked their inherent authority to regulate lawyers to limit attorney fees in mass tort contexts.... not to correct for market failure but rather to protect clients from being charged unreasonable fees"). The

Court notes that although many of the plaintiffs' attorneys in the Vioxx litigation have entered into contingent fee contracts for 33 ⅓% of the claimant's net recovery, there are many other attorneys who have 40% and even 50% contingent fee contracts.

sons, the Court finds that it has the inherent authority and responsibility to examine the individual contingent fee contracts for fairness and consistency.

### 3. The Court's express authority pursuant to the terms of the Settlement Agreement

The terms of the Settlement Agreement in this case provide further support for the Court's authority to examine the reasonableness of the contingent fee contracts. The Settlement Agreement expressly grants this Court the authority to oversee various aspects of the global settlement administration. For example, the Settlement Agreement contemplates that this Court will appoint an Allocation Committee to assist in determining the appropriate amount of fees to be deposited into the Common Benefit Fund. *See* Settlement Agreement § 9.2.4. The Agreement also contemplates that this Court will consider the Committee's recommendations in making a final determination of common benefit fees as well as deciding how those fees should be distributed to individual attorneys for their common benefit work. *See id.* § 9.2.5. Pursuant to the terms of the Settlement Agreement, these amounts will be deducted directly from the attorneys' fees after the Court's final determination regarding the Common Benefit Fund. *See id.* § 9.2.1 ("Any sum paid as a common benefit fee shall be deducted from the total amount of counsel fees payable under individual plaintiffs' counsel's retainer agreement.").

In addition, the Settlement Agreement also establishes that this Court has the express authority to modify any provision of the Agreement in certain limited circumstances if the Court determines that the provision "is prohibited or unenforceable to any extent or in any particular context but in some modified form would be enforceable." *Id.* § 16.42. To the extent that the Settlement Agreement would be unenforceable if it resulted in excessive or unreasonable attorneys' fees that threaten the public interest and reflect poorly on the courts, this Court may address those fees in order to ensure fairness to all parties. As a result, the Court finds that it may examine the reasonableness of contingent fee contracts in order to protect the claimants and enforce the Settlement Agreement.

In light of this Court's equitable authority over the settlement, its inherent authority to exercise ethical supervision over the parties, and its express authority under the terms of the Settlement Agreement, the Court finds that it has the authority to examine the contingent fee contracts in the global settlement for reasonableness, regardless of whether the claimants filed their cases in state or federal courts. *See In re Guidant,* 2008 WL 682174, at *19 (capping contingent fees in global settlement pursuant to "the Court's general equitable powers, the Court's inherent authority to exercise ethical supervision over [the] global settlement, and the Court's inherent authority to review contingency fees for fairness"). In the interest of fairness and uniformity, it is both necessary and desirable that a single court be able to set a reasonable limitation on contingent fees in this global settlement proceeding. Having overseen not only the course of the MDL proceedings but also the administration of the Vioxx Settlement Program, this Court is uniquely situated to examine the reasonableness of attorneys' fees for claimants enrolled in the global settlement. Further, in light of the upcoming distribution of interim settlement payments, the Court finds that it is appropriate at this time to set a reasonable limitation on the contingent fees that attorneys may charge to claimants participating in the settlement.

## B. Applying the Court's authority to examine contingent fee contracts in the global settlement

In order to determine a reasonable limitation on individual contingent fee contracts, the Court will look for guidance to comparable limitations on contingent fees. First, the Court will examine state statutes and rules that cap contingent fee arrangements. Second, the Court will review the manner in which other district courts have approached the issue of contingent fee arrangements in the context of similar global settlements. Finally, the Court will consider the unique contours of the Vioxx global settlement in light of these comparative sources in order to set a reasonable limitation on individual contingent fees in this context.

### 1. State statutes and rules placing limitations on contingent fees

■ Because this MDL proceeding is essentially a series of diversity jurisdiction cases, it is appropriate for the Court to consider state statutes in examining whether the contingent fee contracts are fair or reasonable. *See In re Zyprexa,* 424 F.Supp.2d at 494. New Jersey's approach to contingent fees provides considerable guidance for this Court in determining the appropriate contingent fees in this case. *See* N.J. R. Ct. 1:21–7. The Court notes that the New Jersey rule is particularly persuasive in this context because New Jersey is one of the primary coordinate jurisdictions in the Vioxx litigation. In New Jersey, an attorney in a products liability action "shall not contract for, charge, or collect a contingent fee in excess of the following: (1) 33⅓% on the first $500,000 recovered; (2) 30% on the next $500,000 recovered; (3) 25% on the next $500,000 recovered; (4) 20% on the next $500,000 recovered." *Id.* The New Jersey statute further provides that counsel must apply to the court for a reasonable fee on all amounts in excess of $2 million, and

may not charge more than 25% where the amount recovered is "for the benefit of a client who was a minor or mentally incapacitated when the contingent fee arrangement was made." *Id.* The New Jersey rule therefore provides strong support for limiting attorneys' contingent fees to a reasonable amount in the context of the global settlement.

In addition, the Court is further persuaded by similar rules in California and Texas, the other primary coordinate jurisdictions in the Vioxx litigation. *See* Cal. Bus. & Prof.Code § 6146(a) (providing a sliding scale framework for limiting contingent fees in actions against health care providers); Tex. Lab.Code Ann. § 408.221 (limiting contingent fee arrangements in worker's compensation lawsuits to 25% of the plaintiff's net recovery). Other states have also adopted similar rules or statutes placing comparable limitations on contingent fee arrangements. *See, e.g.,* Conn. Gen.Stat. Ann. § 52–251c(b) (limiting contingent fees in personal injury and wrongful death cases to 33⅓% of the first $300,000; 25% of the next $300,000; 20% of the next $300,000; 15% of the next $300,000; and 10% of any amount exceeding $1.2 million); Mich. Gen. Ct. R. 8.121 (limiting contingent fees in personal injury or wrongful death suits to a maximum of 33⅓% of the net recovery); *see also In re Zyprexa,* 424 F.Supp.2d at 495 (conducting a survey of the states and noting that "[t]he trend in the states is to limit contingent fees in substantial cases to 33 ⅓% or less of net recovery where fees are large").

### 2. Decisions by other courts in similar situations

The instant case presents something of a matter of first impression, due in large part to the global nature of the settlement, the large number of plaintiffs participating in the settlement, and the considerable amount of money in the settlement fund.

With little precedent bearing directly on the facts of the instant case, the Court finds guidance in the decisions of other district courts dealing with similar global settlements. For example, the MDL court in *Guidant* examined contingent fee arrangements in the context of a comparable global settlement resolving state and federal claims. *See In re Guidant*, 2008 WL 682174, at *3 (noting that the global settlement covered "Plaintiffs from both the MDL and state cases, and included Plaintiffs whose cases had been filed or transferred to the MDL, Plaintiffs whose cases were filed outside the MDL in state court proceedings, and potential Plaintiffs who had not yet filed their cases"). The global settlement agreement in *Guidant* provided the district court with authority over the administration of the settlement proceedings, including the authority to decide the amount of fees for common benefit payment. *Id.* at *4. In determining the amount of the common benefit payment fees, the court also addressed the reasonableness of contingent fee contracts, taking into consideration the economies of scale provided by the coordinated proceedings and the global settlement. *Id.* at *17–19. Accordingly, the court capped all individual case contingency fees at 20%, reserving to the parties the right to petition to the special masters for an upward departure subject to certain limiting factors. *Id.* Pursuant to the court's limitations, however, no counsel could recover more than 33⅓% in contingent fees. *Id.*[14]

The court's approach to attorney fees in *Guidant* is consistent with the decisions of other courts in similar circumstances. For example, in the *In re Silicone Gel Breast Implant* MDL, the court recognized a settlement class and allocated 25% of the $4.2 billion settlement fund for attorneys' fees. *In re Silicone Gel Breast Implant Prods. Liab. Litig.*, MDL No. 926, 1994 WL 114580, at *4 (N.D.Ala.1994). Although the settlement ultimately fell through for other reasons, the court suggested that individual contingent fees should be capped at approximately 25% of each plaintiff's net recovery because of the considerable benefits provided by the economies of scale unique to that litigation. *See id.*; *see also* PAUL D. RHEINGOLD, LITIGATING MASS TORT CASES § 7:52 (2006) (describing in detail the court's proposed framework for apportioning fees). Similarly, in *Zyprexa* the court addressed the issue of contingent fees by conducting a thorough analysis of the complexity of the issues of the case, the economies of scale offered by the global settlement, and the persuasive authority of several state rules and statutes. *In re Zyprexa*, 424 F.Supp.2d at 496. Given the unique contours of that case, the court in *Zyprexa* capped contingent fees at 35%, reserving the right to depart upward to 37.5% or downward to 30% based on the facts of each individual case. *Id.* These decisions provide helpful guidance for the Court in approaching the fee determination in the instant case.

### 3. Determining reasonable fees in the context of the Vioxx global settlement

As an initial matter, the Court notes that this is essentially a products liability case, and all products liability cases pose significant challenges to plaintiffs' counsel. The risk of loss for plaintiffs' counsel in these cases is considerable. In addition, the basic challenges inherent in any products liability case were compounded in this case by a host of complex legal issues

---

**14.** *See also Contingent Fees in Mass Tort Litigation, supra,* at 116–20 (collecting cases and examining resolutions of contingent fee arrangements); PAUL D. RHEINGOLD, LITIGATING MASS TORT CASES § 7:46 (2006) (same). Unlike the fees in the present case, the contingent fees in *Guidant* apparently did not include the common benefit fees.

unique to the instant litigation, including (to name only a few) the learned intermediary doctrine, contributory negligence, causation, federal preemption laws, and Merck's assertion of attorney-client privilege with respect to thousands of documents in its possession. The risks associated with pursuing these cases became even more daunting in light of the verdicts returned by juries in this Court's bellwether trials—only one of the six trials resulted in a verdict for the plaintiff. On a single-case basis, therefore, reasonable contingent fees might range from 33% to 40% of the total recovery for each claimant.

In setting a reasonable limitation on contingent fees, the Court is also mindful of the many contributions made by plaintiffs' counsel in furtherance of the administration of the global settlement proceedings. Without the dedication of plaintiffs' counsel from across the nation, the approximately 50,000 claimants currently enrolled in the settlement would have faced considerable difficulties in securing and producing the appropriate records necessary to enroll in the settlement. Nevertheless, the Court must assess the reasonableness of the contingent fees in light of the fact that the economies of scale have led to a global settlement offering considerable benefit to the attorneys.

Instead of pursuing individual discovery, filing individual motions, engaging in individual settlement negotiations, or preparing individual trial plans, attorneys for eligible claimants who wish to participate in the settlement need only enroll the claimants in the settlement and then carefully monitor their progress through the claims valuation process. These economies of scale must cut both ways. The attorneys have benefited from a uniform and highly efficient resolution procedure; the claimants should similarly benefit from fees reduced to reflect that uniformity and efficiency. Even though the unique facts of certain cases may have initially warranted disparate contingent fee arrangements, these individual characteristics no longer control the calculus for determining reasonable fees. *See In re Guidant*, 2008 WL 682174, at *18 ("Because of the mass nature of this MDL, the fact that several firms/attorneys benefited from economies of scale, and the fact that many did or should have benefited in different degrees from the coordinated discovery, motion practice, and/or global settlement negotiations, there is a high likelihood that the previously negotiated contingency fee contracts would result in excessive fees."); *In re Zyprexa*, 424 F.Supp.2d at 493 ("[T]hese firms all benefitted from the effectiveness of coordinated discovery carried out in conjunction with the plaintiffs' steering committee and from other economies of scale, suggesting a need for reconsideration of fee arrangements that may have been fair when the individual litigations were commenced.").

■ In consideration of the various state rules dealing with contingent fees and the decisions of other district courts faced with comparable situations, the Court finds that the individual contingent fee arrangements for attorneys representing claimants enrolled in the Vioxx global settlement should be capped at 32% plus reasonable costs.[15] In reaching this determination, the Court acknowledges the complexity and risk involved in

---

**15.** The Court notes that this percentage is the maximum that ˙any counsel representing claimants enrolled in the Vioxx global settlement may charge in contingent fees. To the extent that any state rule or statute requires a recovery below this percentage, or to the extent that any individual parties may have agreed to a lower percentage contingent fee, this percentage acts only as a ceiling and does not supersede state rules or statutes or reasonable agreements between claimants and their attorneys.

pursuing these cases as well as the fact that any award for common benefit work will later be deducted from this sum.[16] Nevertheless, in light of the large number of plaintiffs, the global settlement, the considerable settlement fund, and the unique contours of this litigation, the Court finds that this is a fair and reasonable framework for apportioning fees. Although perhaps a reduction from the standard 33⅓% to 40% contingent fee applicable on a single-case basis, this reduction will not result in a paltry award for the attorneys. With a total settlement fund of $4.85 billion, limiting attorneys' fees to 32% of the net recovery means that the attorneys in this case will receive more than $1.55 billion.

## III. CONCLUSION

In consideration of the economies of scale offered by the global settlement proceedings and all of the above expressed reasons, IT IS ORDERED that contingent fee arrangements for all attorneys representing claimants in the Vioxx global settlement shall be capped at 32% plus reasonable costs. At a later date after due notice and an opportunity for all counsel to be heard, the Court will determine the appropriate sum for common benefit work. This sum will be deducted from the above amount, reducing the individual attorneys' fees across the board.

**16.** It bears repeating that under no circumstances shall any claimant pay more than 32% of their total award towards attorneys' fees (not including costs). A percentage of the individual attorneys' fees will be used to pay the Common Benefit Fund. Because only interim payments are currently being distributed, the mechanics of withholding common benefit fees will be finalized upon the ultimate calculation of claimants' total awards.